IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>CRAIG JOHN CHISHOLM,<br><br>  Defendant. | MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br><br><br>Case No. 1:10-CR-84 TS |

## I. INTRODUCTION

Defendant moves to suppress evidence found at his residence when he was arrested because (1) the officers did not have a reason to believe he was in the trailer when they executed the search warrant and (2) there was no consent to search the trailer. The Court finds the officers had an ample basis from three independent sources to believe Defendant was in the trailer and that Defendant freely gave consent to search the trailer. Therefore, the Court denies the Motion to Suppress.

## II. PROCEDURAL BACKGROUND

Defendant filed his initial Motion to Suppress prior to the evidentiary hearing.[1] It raised the issues of lack of consent and lack of probable cause. Following the evidentiary hearing, Defendant filed his memorandum as a new Motion to Suppress, raising the issue that the officers lacked a reasonable basis to believe that he was in the trailer when they executed the search warrant.[2] By the second memorandum/motion, he appears to have conceded the issues of consent and probable cause. Defendant then filed an Amended Memorandum amending paragraph 2 of his second Motion to argue that the facts show there was "no evidence which indicated an ownership interest on behalf of Chisholm, only information that he might have resided in the trailer at the address in question."

The government's Memorandum addresses entry into the home based on the felony arrest warrant, reasonable belief that Defendant was currently in the home at the time of the entry, and consent.

## III. FINDINGS OF FACT

A few days before August 3, 2010, Agent Francom of the Ogden City Police Department and assigned to the Weber-Morgan Narcotics Strike Force spoke with a confidential informant known to the Agent (C.I. No. 1). C.I. No. 1 had previously provided reliable information to Agent Francom that had led to narcotics arrests. C.I. No. 1 told the Agent that Craig Chisholm (Defendant) was "on the run" and that C.I. No. 1 knew his

---

[1] Docket No. 51.

[2] Docket No. 51.

whereabouts. C.I. No. 1 gave Agent Francom directions to a trailer in trailer park where Defendant could be located. Agent Francom knew Defendant because he had arrested Defendant on state charges earlier in the summer but did not know if he had made an appearance on those charges.

In the early morning hours of August 3, 2010, Agent Francom was asked to come in to arrange a plan to apprehend Mr. Chisholm. The reason for the meeting was that a federal arrest warrant was issued and another member of the Task Force, Agent Ricks of the Weber County Sheriff's Department, had independently obtained information about Defendant's whereabouts. In preparation, Agent Francom contacted C.I. No. 1 again to confirm the earlier information. C.I. No. 1 elaborated on the information by providing the probable trailer number—12 or 21—and the information that Defendant was driving a light-colored Audi vehicle.

Late on August 2, or early on August 3, 2010, Agent Ricks received information from Agent Grogan that there was a federal warrant for Defendant's arrest. Agent Grogan is an officer with the Ogden Police Department, and is assigned to both the Strike Force and the Project Safe Neighborhood Task Force with the federal agency Alcohol, Tobacco, and Firearms (ATF).

Upon learning of the outstanding warrant, Agent Ricks spoke with his own C.I. (C.I. No. 2) who told the Agent that Defendant was dealing large amounts of methamphetamine from a trailer in a trailer park where Defendant was staying. C.I. No. 2 is independent from C.I. No. 1. C.I. No. 2 told Agent Ricks that he had been inside the trailer he was describing, where the methamphetamine was kept.

Agent Ricks called his sergeant, who requested that he verify the information. Agent Ricks then drove to the trailer park with the C.I. No. 2 directing him by phone right to trailer no. 12. C.I. No. 2 further told Agent Ricks that Defendant drove a blue Audi with California plates. Agent Ricks observed a light blue Audi with California plates at trailer no. 12 and also observed short term traffic coming and going from trailer no. 12, despite the late hour. He called in the information to his sergeant, Sergeant Hutchinson, and then continued to observe trailer no. 12 while he waited for other agents to arrive.

The Sergeant called together other agents, including Agent Francom, who informed the Sergeant he had earlier received similar information about Defendant's whereabouts, information the Sergeant then relayed to Agent Grogan. Agent Francom and Agent Keyes drove to the trailer park where C.I. No. 1 had said Defendant would be located and met up with Agent Ricks and the Sergeant. They saw a light colored Audi parked in front of a trailer no. 12. The Agents continued to observe the trailer and began to formulate a plan to go to the trailer.

As the Agents watched trailer no. 12, two males exited the trailer, entered an SUV and drove to a nearby convenience store. The officers could not determine if one of the males was Defendant, so Agent Ricks and Francom followed the two males and made contact. Agent Francom spoke to the driver and Agent Ricks spoke to the passenger. Both of the males told the officers that Defendant did live at trailer no. 12, that he was located in the trailer and, specifically, that he was presently asleep in the trailer's back bedroom. Agents Francom and Keyes relayed that information to the officers still surveilling the trailer. The Agents on the scene then approached the trailer. Agent

Ricks and another agent held the perimeter while the Sergeant and others went to the front door. Through the window the officers on the perimeter observed a "meth bong" in the kitchen. When the Sergeant and another agent knocked on the trailer's front door, a male answered, saw the Sergeant and others dressed in police jackets and heard them identify themselves as police and immediately tried to shut the door. The officers entered and the Sergeant saw a female he recognized from prior contacts. She started to run toward a back room, the officers yelled for her to stop, but instead she entered a back room and shut the door. Concerned that she was running to access a weapon, the officers followed, opened the door and entered. The female was standing and a man, who turned out to be Defendant, was sleeping in a bed. The officers detained the female and also detained Defendant.

Agent Grogan told Defendant they had a warrant for his arrest, that he had been indicted and then gave him his *Miranda* rights while the other officers secured the trailer. Defendant indicated he understood his *Miranda* rights and agreed to speak with the officers. Agent Grogan then began going back and forth between the rooms to check on the conversations with Defendant and with the female who was being held in another room. While Agent Grogan was in the other room, the Sergeant asked Defendant if it was okay if they searched the room and Defendant said it was fine. No one told Defendant they had a search warrant and he was not threatened. He was cooperative from the beginning of the encounter, going so far as to describe the location of the drugs for the officers when they could not be immediately located. Other agents started to search the room while the Sergeant went out to the main room where he told the female her *Miranda* rights. Like

Defendant, the female, agreed to speak with the officers after hearing her *Miranda* rights. Upon questioning by the Sergeant, the female said the trailer was her home, shared with Defendant, and that they both had access to the entire home. Asked if she would consent to a search, she deferred to Defendant. The Sergeant responded with the information that Defendant had already consented but that he, the Sergeant, would be more comfortable if they both consented. She responded that if Defendant was fine with it, so was she.

Agent Grogan went back to speak with Defendant and asked him for consent to search. Defendant stated he wanted to be cooperative, and then asked what he would get by being cooperative or giving consent. Agent Grogan replied that he would mark in his report that Defendant was cooperative or not cooperative. Defendant repeated that he wanted to cooperate and explained that he had *already* given consent to search to another officer. During the search, the agents found firearms, drugs, cash, and owe sheets.

IV. DISCUSSION AND CONCLUSIONS

A. Reasonable Belief Defendant Was in Trailer at the Time of Entry

In *Payton v. New York*,[3] the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."[4] There is no challenge to the probable cause underlying the arrest warrant in the present case.

---

[3] 445 U.S. 573 (1980).

[4] *Id*. at 603.

6

*Payton* is explained in the Tenth Circuit case, *Valdez v. McPheters*:[5]

> the Supreme Court has emphasized that the Fourth Amendment draws "a firm line at the entrance to the house," prohibiting a warrantless entry except in limited circumstances.
>
> One of the circumstances which may permit an entry into a residence without a search warrant is the existence of a valid arrest warrant for a suspect who is believed to live in the residence. This is because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." "Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home."[6]

Under *Payton* and *Valdez*, the officers were entitled to enter the trailer "if there was a reasonable basis for believing that [Defendant] both (1) lived in the residence and (2) could be found within at the time of entry."[7]

> Turning to the second prong of the Payton test, courts "must be sensitive to common sense factors indicating a resident's presence." Direct surveillance *or the actual viewing of the suspect on the premises is not required*. Indeed, the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts. The suspect's presence may be suggested by the presence of an automobile . . ..
>
> No single factor is, of course, dispositive. Rather, the court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within [8]

---

[5] 172 F.3d 1220 (10th Cir. 1999).

[6] *Id.* at 1224 (quoting *Payton*, 445 U.S. at 590 and *Steagald v. United States*, 451 U.S. 204, 214 n. 7 (1981)).

[7] *Valdez*, 172 F.3d at 1225.

[8] *Id.* at 1226 (emphasis added and citations and footnote omitted).

7

One consideration which is not relevant to this determination involves information gained after the entry. Since the focus is the reasonableness of the officers' actions, evidence which is obtained after the entry cannot be used to establish the legality of those actions or, conversely, invalidate an otherwise reasonable entry.[9]

Defendant argues that the officers entered the trailer without having reason to believe that he was on the premises. Defendant argues that the officers had only vague and conflicting information, they never saw him insider the trailer or entering the trailer and it is "highly likely that the officers executed the warrant before" the two males leaving the trailer "confirmed [Defendant's] location inside the trailer."[10]

The Court finds that the evidence shows that the information on Defendant's whereabouts in trailer no. 12 was very consistent and was provided from three different sources, C.I. No. 1, C. I. No. 2, and the two males who had just left the trailer. The information from the CIs on the trailer park's location was entirely consistent with both describing the physical location by direction rather than street address. The first C.I. provided the trailer number with reasonable precision and the second guided the officer directly to the trailer. Both identified the make of Defendant's car, the second identifying it by specific color and as having a California plate. It is correct that the officers did not see the Defendant entering or in the trailer but, as explained in *Valdez*, above, "actual viewing of the suspect on the premises is not required."[11]

There is nothing but the unsupported speculation that the officers executed the

---

[9] *Id*. at 1226 n. 3.

[10] Docket No. 51 Def.'s Mem. at 5

[11] *Valdez*, 172 F.3d at 1226.

8

warrant before the two males were stopped. The testimony at the hearing was clearly that the two males were stopped and questioned, and their information relayed to the other officers prior to those officers entering the trailer. The Court found the officers' testimony as to the sequence of events to be credible and unchallenged. Further, Defendant's speculation about the sequence of events is not supported by logic because it would not have been logical to have executed the warrant on the trailer before the officers had ascertained that neither of the two males leaving the trailer was Defendant. Those two males provided further corroboration that Defendant "could be found within at the time of entry," by their specific information that he was there and was located in a back bedroom.

The Court finds that all of the circumstances in this case show that the officers had a reasonable belief that the suspect resided there and would be found within the trailer before entering Defendant's residence.

B. Consent

Defendant appears to have conceded his earlier argument on lack of consent to search. However, because it was raised, the Court will address consent.

> [W]here the validity of a search rests on consent, the [government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.[12]

"[W]hether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of all

---

[12] *Florida v. Royer*, 460 U.S. 491, 497 (1983).

9

the circumstances."[13]

Factors to consider within the totality of circumstances include:

physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.[14]

Defendant was arrested prior to his consent. However, that fact alone does not demonstrate that the consent was coerced.[15] Neither does the fact that he was not specifically informed of his "Fourth Amendment right to refuse consent."[16]

Defendant was advised of his *Miranda* rights and stated that he understood them before he was asked for consent. He had also agreed to speak with the officers before he gave consent. Defendant was detained at the time of the consent. However, he was unusually cooperative and stated his desire to be so. There was no use of violence, threats,

---

[13] *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

[14] *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) (quoting *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (citations omitted)).

[15] *United States v. Romero*, 247 Fed. Appx. 955, 963 (10th Cir. 2007) (citing *United States v. Watson*, 423 U.S. 411 (1976) (noting that "the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search") (other citations omitted)).

[16] *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997).

or trickery. There were several officers on the scene, but there is nothing in the record to show that any of the officers acted in a loud, threatening, or intimidating manner. Defendant placed no limit on the scope of his consent to search. In fact, he encouraged further search by telling the officers to look further or in different areas when they could not immediately find some objects where Defendant had indicated they would be. It was Defendant, not the officers, who initiated the idea of receiving something for the cooperation in the consent. But significantly, he did not do so until after he had already given consent and the search was started. Told that the only thing to gain was a note in the report, Defendant nonetheless volunteered to Agent Grogan that he had already given his consent to another officer and repeated that he wanted to cooperate.

Under the totality of these circumstances, the Court finds that Defendant freely and voluntarily consented to the search of the trailer. Defendant had shared access to the entire trailer, and, therefore, his consent covers the entire trailer.

## V. ORDER

Based on the foregoing, it is

ORDERED that Defendants' Motions to Suppress (Docket Nos. 42 and 51) are DENIED. It is further

ORDERED that the time from the filing of the Motion to July 15, 2011, is excluded from the Speedy Trial Act calculation under 18 U.S.C. § 3161(h)(1)(D) and (H). As the Court calculated the Speedy Trial Act time, there are 35 days of Speedy Trial remaining.

The Court will set this matter for an immediate status and scheduling conference. Counsel should be prepared to inform the court of the earliest possible time they can be prepared for trial and their estimates of the length of trial.

DATED   July 19, 2011.

                              BY THE COURT:

                              _____
                              TED STEWART
                              United States District Judge